IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SUSAN M. ERKKILA, | ) | CASE NO. 1:15CV2162 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Susan Erkkila ("Erkkila") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 11.

During the hearing before the Administrative Law Judge ("ALJ"), Erkkila, who was not represented, indicated that she was receiving treatment from a doctor whose recent treatment notes were not in the record.  The ALJ stated that, on the record presented, it was "impossible to determine the full extent of [Erkkila's] symptoms and limitations" (Tr. 27) but the ALJ proceeded nonetheless to determine Erkkila's RFC and make a disability determination.  This was error in that the ALJ failed to fully develop the record.  Accordingly, the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

**I. Procedural History**

1

On February 22, 2012, Erkkila filed applications for Medicare benefits as a Medicare Qualified Government Employee ("MQGE"),[1] DIB and SSI, alleging a disability onset date of January 29, 2011. Tr. 17, 174, 211. She alleged disability based on bipolar disorder and depression. Tr. 222. After denials by the state agency initially (Tr. 68, 90) and on reconsideration (Tr. 90, 93), Erkkila requested an administrative hearing. Tr. 95-96. A hearing was held before Administrative Law Judge ("ALJ") Nicholas J. Lo Burgio on February 27, 2014 (Tr. 41-67). In his March 23, 2014, decision (Tr. 17-32), the ALJ determined that Erkkila could perform jobs that exist in significant numbers in the national economy, i.e., she was not disabled. Tr. 31. Erkkila requested review of the ALJ's decision by the Appeals Council (Tr. 9) and, on August 25, 2015, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Erkkila was born in 1961 and was 50 years old on the date her application was filed. Tr. 211. She completed high school and previously worked for 18 years as a teacher aide and school bus monitor, during which time she received additional training. Tr. 50, 54, 64. She last worked in 2011. Tr. 51.

### B. Relevant Medical Evidence

From March 29, 2011, through April 4, 2011, Erkkila was hospitalized for a history of depression and anxiety and psychosis/paranoia. Tr. 297-310. Her attending psychiatrist was Joseph Baskin, M.D., who had also been providing outpatient treatment to her and who had recommended to her that she be hospitalized. Tr. 297. Upon admission, Erkkila reported

---

[1] MQGE status pertains to the amount of benefits an eligible claimant receives. *See* 42 C.F.R. 406.15.

2

having issues at work and home, including threats by teachers at the school where she worked. Tr. 299. The school had placed her on leave from work in January because of her behavior. Tr. 301-302. Dr. Baskin detailed her 9-month history of deteriorating mental health marked by significant disorganization, paranoia, poor judgment, and lack of insight. Tr. 302. At the time of her admittance she was still disorganized and manic, had pressured speech, disorganized thought, paranoid ideation and severe paranoia. Tr. 297. Dr. Baskin started her on Risperidone. Tr. 297. Erkkila was discharged in stable condition and had residual symptoms of mania and psychosis. Tr. 298. Her symptoms were much improved and Dr. Baskin stated that he believed that they could be managed on an outpatient basis. Tr. 298. He diagnosed Erkkila with Bipolar I Disorder with psychotic features and assessed a Global Assessment of Functioning ("GAF") score of 58.[2] Tr. 298.

On July 21, 2011, Erkkila was admitted to Windsor-Laurelwood Center for Behavioral Medicine as an inpatient after she took an overdose of Xanax, Klonopin and trazadone. Tr. 259-266. She also cut her wrists. Tr. 261. She was feeling acutely suicidal and reported worsening depression over the previous months, most of which was due to financial issues. Tr. 261. She denied having abused Klonopin or Xanax in the past and denied having any problems with drugs or alcohol. Tr. 261. James Psarras, M.D., noted her diagnosis of bipolar disorder and Erkkila also stated that she suffers from agoraphobia. Tr. 261. She underwent individual and group therapy, her medications were adjusted, and she was prescribed Lithium. Tr. 259. She was

---

[2] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id*.

discharged on July 26, 2011, as stable and with a diagnosis of bipolar, depressed.  Tr. 259.  Dr. Psarras assessed a GAF score of 65.[3]  Tr. 259.

By March 5, 2012, Erkkila had moved to Colorado and saw William Scholten, M.D., for psychiatric care.  Tr. 271-275.  Upon examination, Erkkila had "some tears," neat dress, and normal psychomotor activity.  Tr. 274.  She was alert and cooperative; had an appropriate mood and affect; normal, logical controlled speech; and a linear thought process.  Tr. 274.  Dr. Scholten diagnosed Erkkila with bipolar disorder and assessed a GAF score of 70.  Tr. 275.  On April 7, 2012, Erkkila reported to Dr. Scholten that her medication caused "shakiness."  Tr. 270.  She had mood disturbances but was "okay."  Tr. 270.  He assessed Erkkila as stable and adjusted her medications.  Tr. 270.  On May 1, 2012, he noted that Erkkila's condition had improved and recommended maintaining her present medication regimen.  Tr. 269.

By June 21, 2013, Erkkila had returned to Ohio and began seeing Abraham Wolf, Ph.D.  Tr. 286.  She reported that she had been babysitting her grandchildren (10-month-old twins) and was enjoying this.  Tr. 286.  Her financial condition had improved.  Tr. 286.  Upon exam, she was cooperative, articulate and depressed with no signs of psychosis.  Tr. 287.  Her energy and concentration were good; she was not as depressed at she had been; and she did not experience despair as before.  Tr. 287.  She reported that she had stopped drinking alcohol four years ago but avoided Alcoholics Anonymous ("AA") meetings because she wanted to avoid others and was worried she would have a panic attack because she had had a panic attack previously at an AA meeting.  Tr. 286-287.  Dr. Wolf advised that she increase her social contacts.  Tr. 288.

---

[3] A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR, at 34.

On July 11, 2013, Erkkila told Dr. Wolf that she drives 120 miles a day to babysit her grandchildren.  Tr. 289.  She recently attended an AA meeting but needed a tranquilizer to help her through it.  Tr. 289.  She stated that she did not know much about bipolar disorder and Dr. Wolf recommended patient education.  Tr. 289.  On August 9, 2013, Erkkila was less anxious and depressed.  Tr. 290.  She reported that she had gone to an AA meeting on her own.  Tr. 290.  On September 19, 2013, Erkkila described fears of losing her income as a babysitter for her grandchildren. Tr. 291.  She stated that her daughter-in-law appeared to be threatened by the twins' attachment to her and reduced her hours as a way to exclude her.  Tr. 291.  She remained phobic of AA meetings.  Tr. 291.

On October 31, 2013, Erkkila was less depressed and less fearful of losing her babysitting position—her childcare responsibilities had been increased.  Tr. 292.  She did not, however, receive additional wages and she was concerned about her finances.  Tr. 292.  She was "very concerned" about changes in her disability benefits she had been receiving after her separation from her job with the school and she remained socially avoidant.  Tr. 292.  On December 12, 2013, Erkkila was less depressed and returned to weekly AA meetings.  Tr. 293.  She was more comfortable at the meetings and stated that the primary benefit of attending was her sense of fellowship.  Tr. 293.  On January 14, 2014, Erkkila was less depressed but remained anxious in social situations.  Tr. 294.  She continued to babysit, attend AA meetings, and she had learned more about bipolar disorder, including the importance of medication compliance.  Tr. 294.

### C. Medical Opinion Evidence

#### 1. Consultative Examiner

On May 22, 2012, Erkkila, while living in Colorado, saw psychologist Vanessa Rollins, Ph.D., for a consultative examination.  Tr. 276-279.  Erkkila's chief complaint was bipolar

5

disorder. Tr. 176. She reported symptoms of guilt, low self-esteem, and trouble concentrating but her other depressive symptoms had improved. Tr. 276. She had "constant ups and downs" and stated that she self-medicated with alcohol in the past and her mental health symptoms were triggered when she stopped drinking about three years ago. Tr. 276-277. She stated that the last two years her mood and anxiety have been much worse. Tr. 277. She reported having a previous diagnosis of anxiety and endorsed difficulty controlling her worrying about multiple issues that caused significant distress. Tr. 276. She had had panic attacks "in the past but not lately" and stated that medication helped. Tr. 276.

Erkkila stated that she had been hospitalized twice in the last year and had received outpatient treatment from Dr. Baskin, but that she was not receiving counseling since having moved to Colorado. Tr. 276-277. She had trouble finding affordable care. Tr. 277. She moved to Colorado for a "fresh start" and lived with a friend. Tr. 277. She had three adult children with whom she had a good relationship and she also had three siblings who were supportive. Tr. 277. She stated that she helped out with her friend's daughter, cleaned, cooked, refinished furniture, and was able to perform self-care tasks. Tr. 277.

On mental status examination, Dr. Rollins observed that Erkkila's mood was mildly depressed, her affect was normal and appropriate, she was alert and oriented, and she had intact recent memory and grossly intact remote memory Tr. 278. She showed good concentration in spelling, performed serial sevens slowly, and had two errors subtracting. Tr. 278. She had average intellectual functioning; coherent, logical and tangential thoughts; she denied suicidal and homicidal ideation; and her judgment and insight "appeared good." Tr. 278. Dr. Rollins stated that Erkkila's mental health symptoms were improving but opined that she was not receiving counseling to work actively on the coping skills necessary to maintain sobriety while

6

living with a mental illness. Tr. 278. Dr. Rollins found her to be motivated towards recovery and would likely benefit from such counseling. Tr. 278. She opined that it was unlikely Erkkila could return to her past work because it was highly stressful and Erkkila was in the early stages of improvement. Tr. 278. If Erkkila received counseling, she would be a good candidate for vocational rehabilitation. Tr. 278. Her prognosis was guarded because she was not currently receiving mental health treatment and she would benefit from psychiatry and individual and group counseling. Tr. 280. Dr. Rollins diagnosed Bipolar Disorder, NOS and Generalized Anxiety Disorder. Tr. 278. She assessed a GAF score of 60. Tr. 279.

### 2. State Agency Reviewer

On June 18, 2012, James Wanstrath, Ph.D., a state agency psychologist, reviewed Erkkila's file. Tr. 69-76. Regarding Erkkila's residual functional capacity, Dr. Wanstrath opined that Erkkila was moderately impaired in her ability to maintain attention and concentration for extended periods, to work in coordination with or in proximity to others without being distracted, to complete a normal workday and workweek without interruption from psychologically based symptoms, and to perform at a consistent pace without an unreasonable length and number of rest periods. Tr. 75-76, 86-87. Her ability to interact appropriately with the public and get along with coworkers and peers was also moderately impaired. Tr. 76, 87. Dr. Wanstrath opined that Erkkila could perform work that did not involve tasks of more than limited complexity and attention to detail. Tr. 76, 87.

### D. Testimonial Evidence

#### 1. Erkkila's Testimony

Erkkila was unrepresented at the time she testified at the administrative hearing. Tr. 44-67. She stated that she lives with her brother and his wife, who are both retired. Tr. 61-62.

7

When asked what she sees as her biggest problem impeding her ability to work, she listed anxiety, confusion, racing thoughts, and panic attacks. Tr. 56. She was trying to deal with "that" with her psychiatrist, Dr. Baskin, but she has come to the realization that "this is something that I am going to have the rest of my life." Tr. 56. It bothers her that she has no control over her illness. Tr. 56. She cannot stop her confusion or her anxiety. Tr. 56.

Erkkila stated that every morning when she gets up she is shaking. Tr. 56. Then her anxiety starts: currently, she experiences it as "more in my head the racing, the worrying, the fear." Tr. 57. It can sometimes cause her stomach to feel bad. Tr. 57. When asked how frequently she gets panic attacks, she stated that she has been sober for five years and has tried to go to AA meetings "and I get quite a few panic attacks there." Tr. 57. She started taking a half of Lorazepam to stop the attacks and to calm her down. Tr. 57. "But I think with each one I have then I become more—you know, it's weird because I don't want to go back out, you know, or to the grocery, you know, try to get—do grocery." Tr. 57. She stated that she feels fortunate that she has a family that she can visit and feel comfortable being with. Tr. 57.

It takes her 70 minutes to drive to her son's house where her grandchildren live. Tr. 58. She goes "as much as I can," about three days a week. Tr. 58. She is currently receiving mental health treatment from her psychiatrist, Dr. Baskin, at the Cleveland Clinic and her psychologist, Dr. Wolf. Tr. 58. Her medications include Prozac, Gabapentin, Lithium Carbonate, and Clonazepam. Tr. 58. The medications cause side effects, including weight gain and her shakiness in the morning. Tr. 59. She explained, "other than that I really try to not to even look up the side effects because, you know, I don't truly want to even know what they are to put it in my head because, you know, I'd create them in my head." Tr. 59.

Erkkila testified that when she was admitted to the hospital in March 2011 they told her she was in the manic phase.  Tr. 60.  She remained hospitalized until her medications were correct.  Tr. 60.  She went through a lot of different side effects with a lot of different medications.  Tr. 60.  She was hospitalized again in July 2011 after she tried to commit suicide: "I didn't realize it was a side effect of one of the medications I was on."  Tr. 60.  When asked if she had any other problems beyond her mood disorder and her anxiety disorder, Erkkila stated, "None .... I think I tend at this point now [to] go a little bit more on the depressive side.  But I think that too because of it makes it difficult either to deal with a lot of things."  Tr. 61.

### 2.  Vocational Expert's Testimony

Vocational Expert ("VE") Martin Rauer testified at the hearing.  Tr. 63-66.  The ALJ discussed with the VE Erkkila's past relevant work.  Tr. 64.  The ALJ asked the VE to determine whether a hypothetical individual of Erkkila's age, education and work experience could perform the work she performed in the past if the individual had the following characteristics: can perform work at all exertional levels; cannot climb ladders, ropes or scaffolding; must not work with or near open dangerous moving machinery or at unprotected heights; can understand, remember, and carry out work instructions and procedures that could be learned in a period of approximately 60 days and are of limited complexity and attention to detail; cannot interact with the public; and can frequently interact with coworkers and supervisors.  Tr. 65.  The VE answered that such an individual could not perform Erkkila's past relevant work.  Tr. 65.  The ALJ asked if such an individual could perform any work and the VE answered that such an individual can perform work as an assembler of small products (140,000 national jobs; 1,750 state jobs) and electronics worker (103,000 national jobs; 1,000 state jobs).  Tr. 66.

9

The ALJ asked the VE whether the same hypothetical individual could perform the jobs identified by the VE if the individual would be limited to frequent bilateral handling and fingering.  Tr. 66.  The VE answered that his answer would not change.  Tr. 66.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past

        relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his March 23, 2014, decision, the ALJ made the following findings:

1.     The claimant meets the MQGE insured status requirements through December 31, 2016. Tr. 19.

2.     The claimant has not engaged in substantial gainful activity since January 29, 2011, the alleged onset date. Tr. 19.

3.     The claimant has the following severe impairments: affective disorder— depressive disorder vs. bipolar disorder, anxiety disorder with agoraphobia features, and psychosis disorder not otherwise specified. Tr. 20.

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 21.

5.     The claimant has the residual functional capacity to perform a full range of work at all exertional levels, but with the following limitations: The claimant must never climb ladders, ropes, or scaffolds. The claimant must never work near open dangerous moving machinery or at unprotected heights. The claimant is able to understand, remember, and carry out

---

[4] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

        instructions that can be learned in a period of approximately 60 days. The claimant is able to tolerate frequent interaction with coworkers and supervisors. The claimant is unable to tolerate work interaction with the public. The work should be of limited complexity or attention to detail. The claimant is limited to frequent handling and fingering with the bilateral upper extremities secondary to tremors.   Tr. 23.

6.     The claimant is unable to perform any past relevant work.  Tr. 30.

7.     The claimant was born on July 29, 1961 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 30.

8.     The claimant has at least a high school education and is able to communicate in English.  Tr. 30.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 30-31.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 31.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 29, 2011 through the date of this decision. Tr. 32.

## V. Parties' Arguments

Erkkila challenges the ALJ's decision on two grounds.  She argues that the ALJ's RFC assessment and resultant hypothetical to the VE is not supported by substantial evidence and that the ALJ failed in his duty to fully and fairly develop the record.  Doc. 13, pp. 5-8.  In response, the Commissioner submits ALJ's RFC assessment and hypothetical is supported by substantial evidence and that the ALJ sufficiently developed the record.  Doc. 16, pp. 10-16.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ failed to fully develop the record

Erkkila argues that the ALJ failed to fully develop the record and that the record is "incomplete." Doc. 13, p. 7. She states that she informed the agency that she was treating with Dr. Baskin and that she testified at the Hearing in February 2014 that she was treating with Dr. Baskin, but that the record contained treatment notes from Dr. Baskin from 2011 only. Doc. 13, p. 7. She asserts that the ALJ should have ordered Dr. Baskin's more recent records be requested or should have told her that they were not part of the record. Doc. 13, pp. 7-8. She also contends that the ALJ failed to ascertain how frequently she had panic attacks. Doc. 13, p. 8.

An ALJ has a duty to provide a claimant with a full and fair hearing. *Lashley v. Sec. of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983). "Under special circumstances— when a claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures—an ALJ has a special, heightened duty to develop the record." *Wilson v. Comm'r of Soc. Sec*., 280 Fed. App'x 456, 459 (6th Cir. 2008) (citing *Lashley*, 708 F.2d at 1051–1052). There is no bright line test; instead, a court decides the issue on a case by case basis. *Lashley*, 708 F.2d at 1052.

The ALJ failed to provide Erkkila with a full and fair hearing.  The record shows that Erkkila informed the agency in December 2013 that Dr. Baskin was her current treating source.  Tr. 246.  On January 6, 2014, the agency sent a records request to Dr. Baskin for medical records "from 1/29/11 to present."  Tr. 295.  Dr. Baskin only sent medical records from 2011 that appear to be related to her hospital admittance and discharge in March/April 2011.  Tr. 296-315.  There are no treatment notes from Dr. Baskin prior to Erkkila's hospital admittance in March 2011 or any time after her discharge in April 2011, despite numerous references to Dr. Baskin's outpatient treatment of Erkkila contained in the record.  *See, e.g*., Tr. 297 (Dr. Baskin's note upon Erkkila's admittance to the hospital in March 2011: "The patient is a 49-year old woman, well known to me from the outpatient practice"); Tr. 286 (June 2013 intake evaluation form filled out by Dr. Wolf: "Dr. Baskin CCF seeing him since 2010"), Tr. 287 ("Sees Baskin every two months"); Tr. 277 (Dr. Rollins consultative examination notes, "She was in outpatient psychiatry with a Dr. Baskin as well"); Tr. 259 (admission/discharge notes from Erkkila's second hospital stay in July 2011 referencing that she is followed by a psychiatrist at the Cleveland Clinic).  Furthermore, at the Hearing, the ALJ asked Erkkila if she was currently receiving treatment and she replied, "Yes, I am.  I have Dr. Bask [sic] down at the Cleveland Clinic who's phenomenal.  He's my psychiatrist and I also have Dr. Wolf[], who's my psychologist, but in Beachwood, Ohio."  Tr. 58.  When the ALJ asked Erkkila what her greatest impediment to working was, Erkkila responded that it was her anxiety, confusion, racing thoughts, and panic attacks, and added, "And, you know, I know we're trying to deal with that, Dr. Bask [sic], my psychiatrist, and different things..."  Tr. 56.  Thus, the ALJ knew, or should have known, that Erkkila received treatment in the past from Dr. Baskin and was at the time of the Hearing receiving treatment from Dr. Baskin.  In his decision, the ALJ even referred to Dr.

Baskin as a treating source.  Tr. 25 (describing discharge notes from her first hospitalization, in April 2011: "The treating source [Dr. Baskin] concluded that the claimant's symptoms could adequately be managed through outpatient treatment.").  The next sentence in this treatment note cited by the ALJ continues, "[Erkkila] will be discharged home in stable condition to follow up with me on 04/13/2011."  Tr. 298.  Thus, the ALJ had ample evidence that Dr. Baskin was Erkkila's treating psychiatrist and that there were outpatient treatment records that were absent from the record.

     Moreover, the ALJ actually bemoaned the lack of treatment notes in his decision.  He complained, "While the claimant has reported severe and debilitating mental impairments, the record contains very few medical records and the available records detail very sporadic treatment."  Tr. 25.  He also lamented, "The claimant did discuss [with Dr. Wolf in 2013] how to manage her current anxiety and depression, but the record does not contain a mental status examination or other objective findings, so it is impossible to determine the full extent of the claimant's symptoms and limitations."  Tr. 27.  Despite the fact that the ALJ declared it was "impossible" to determine the full extent of Erkkila's limitations, he did not order a further assessment or attempt to locate Dr. Baskin's missing treatment notes.  Instead, he assessed an RFC detailing the full extent of Erkkila's limitations.  At the beginning of the Hearing, the ALJ asked Erkkila if she received the CD sent by the agency with the exhibits on it and she said that she had received the CD but that she had not looked at the CD.  Tr. 44.  The ALJ did not press the matter further.  Instead, knowing that Erkkila had not viewed the exhibits and that she was treating with a source whose notes were not in the record, the ALJ did not attempt to locate them.  He only complained that there were few treatment notes in the record and then based his decision on what he admitted was a very limited and sporadic record.

15

Lastly, the ALJ's consideration of the evidence he did have was not accurate. Regarding Erkkila's panic attacks, the following exchange occurred at the Hearing:

ALJ: How frequently do you get panic attacks?

Erkkila: As long as I don't go anywhere. No, I'm being factitious, but being calm I tried to – I have been recovered of alcoholism for five years now; almost five years. And I've tried to go back to meetings and I get quite a few panic attacks there. And what I started doing or tried to do is take, like, a half of Lorazepam to kind of stop that and calm me down. And, but I think with each one I have then I become more – you know, it's weird because I don't want to go back out, you know, or to the grocery, you know, try to get – do grocery. And that is an ordeal in itself, you know. So, I think, like, I said I think it's kind of a blessing that I have three grandchildren that I can go down and feel comfortable there just being with and being around my family who I know. Everyone in my family loves me and wants to see the best for me. You know, I don't truly understand it. And so, it's hard for me to expect it [sic] anyone in the family to understand it.

ALJ: Do you see your grandchildren daily then pretty much?

Tr. 57-58. Erkkila did not answer the question, "how frequently do you get panic attacks?" In his decision, the ALJ remarked that Erkkila did not answer the question. Tr. 24 ("The undersigned attempted to ascertain how often the claimant has a panic attack, but she did not describe the frequency or duration of her panic attacks."). The ALJ, however, did not re-direct Erkkila at the Hearing to answer the question, "how frequently do you get panic attacks?" and he never asked her to describe the duration of her panic attacks. Despite, again, citing a lack of evidence (and criticizing Erkkila for not discussing something she was never asked to discuss), the ALJ concluded that Erkkila's panic attacks had been reduced because she attended AA meetings and testified that her medication helped calm her down. Although there is some evidence in the record to support such a conclusion, some of the evidence relied upon by the ALJ was not as the ALJ described it. Detailing a June 2013 treatment note, the ALJ stated,

> The claimant did report continued anxiety with panic attacks, but she admitted that her last panic attack had occurred almost four months earlier when she attended an [AA] meeting. Such a significant gap between panic attacks indicates that they do not reach a debilitating level. The claimant's reports combined with the objective findings show that

16

the claimant continued to experience severe, but not debilitating symptoms related to her mental health impairments.

Tr. 27.  The June 2013 treatment note states:

Panic attack—last one in February at an AA meeting; not frequent because avoids situations that were bringing them on; believes that she is not attending now because of fear of panic attacks and just wants to avoid others;

Tr. 287.  Although the ALJ accurately stated that in June 2013 Erkkila's last panic attack was four months prior, he ignored the rest of the evidence—i.e., her panic attacks stopped because she stopped going places.  *See also* Tr. 57 (Hearing, wherein Erkkila appeared to indicate she is less inclined to go out).

In sum, the ALJ had a limited record before him; acknowledged that he had a limited record before him and complained that the limited record made it difficult, indeed, "impossible to determine the full extent of [Erkkila's] symptoms and limitations" (Tr. 27); knew or should have known that Erkkila had a long-term treating psychiatrist whom she saw regularly for outpatient treatment and whose treatment notes were missing from the record; knew that Erkkila did not view the exhibits on the CD prior to the Hearing and was unrepresented at the time; and, when given an incomplete and unsatisfactory answer to a question at the Hearing, did not probe further and then complained, in his decision, that he did not get a satisfactory answer.  The ALJ's misreading of the treatment note regarding Erkkila's panic attacks was, perhaps, an effort to make sense of this sparse and somewhat inconsistent record, but (1) it was an incorrect reading of the treatment note; and (2) the better path would have been to develop the record fully, rather than pressing ahead with a decision.  The ALJ failed to fully develop the record and, thus, his decision must be reversed.  *See Lashley*, 708 F.2d at 1051.

**B. Erkkila's additional challenge to the ALJ's RFC assessment**

17

The Court cannot determine whether the ALJ's RFC assessment and hypothetical to the VE are supported by substantial evidence because the ALJ's decision was based on an incomplete record. Accordingly, the Court does not address Erkkila's additional argument based on the current record. On remand, the ALJ will have an opportunity to fully develop the record and reassess Erkkila's RFC.

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.[5]

Dated: August 8, 2016

Kathleen B. Burke
United States Magistrate Judge

---

[5] This Opinion should not be construed as a recommendation that, on remand, Erkkila be found disabled.

18